**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO. 1:26-CR-20035-KMW

UNITED STATES OF AMERICA,

v.

TOMAS NIEMBRO CONCHA,

Defendant.
_________________________________________/

# DEFENDANT'S SENTENCING MEMORANDUM AND MOTION FOR A DOWNWARD VARIANCE OR, IN THE ALTERNATIVE, A DOWNWARD DEPARTURE

## I. INTRODUCTION

Defendant Tomas Niembro Concha ("Mr. Niembro"), through undersigned counsel and pursuant to 18 U.S.C. § 3553(a), respectfully moves for a sentence below the advisory guideline range. Mr. Niembro is a 64-year-old first-time offender who pleaded guilty to both counts of the Information, stipulated to the facts of his offenses, ECF No. 89, and does not contest them here. For the grounds set out below, he respectfully requests a sentence of 48 months' imprisonment, and in no event a sentence greater than 60 months.

## II. THE ADVISORY GUIDELINE RANGE

The parties jointly recommended a combined offense level of 37, less any adjustment for acceptance of responsibility, at Criminal History Category I. ECF No. 90 ¶ 7; PSR ¶ 3. With the two-level reduction for acceptance of responsibility and the additional one-level reduction the Government agreed to move for at offense level 16 or greater, ECF No. 90 ¶ 6; PSR ¶ 2, that is a total offense level of 34 and a range of 151 to 188 months. Addendum at 4. Over the Government's objection, ECF No. 93, the Probation Office applied a four-level aggravating-role adjustment

under U.S.S.G. § 3B1.1(a), producing a total offense level of 38 and a range of 235 to 293 months. The dispute is unresolved and before the Court. Addendum at 3–4; Fed. R. Crim. P. 32(i)(3)(B). For the reasons stated in Mr. Niembro's separately filed objections, which the Government's own objection anticipated, the Court should adopt the parties' calculation: total offense level 34, range 151 to 188 months. The grounds below, however, warrant the requested sentence under either calculation.

## III. LEGAL FRAMEWORK

### A. Section 3553(a).

The Court must impose a sentence "sufficient, but not greater than necessary," to serve the purposes of sentencing. 18 U.S.C. § 3553(a). The Guidelines are "the starting point and the initial benchmark," but the Court "may not presume that the Guidelines range is reasonable" and "must make an individualized assessment based on the facts presented." *Gall v. United States*, 552 U.S. 38, 49–50 (2007); *see Kimbrough v. United States*, 552 U.S. 85 (2007); *United States v. Hunt*, 459 F.3d 1180, 1184 (11th Cir. 2006) ("If *Booker* is to mean anything, it must be that district courts are obligated to impose a reasonable sentence, regardless of the Guidelines range, so long as the Guidelines have been considered."). "Matters such as age, education, mental or emotional condition, medical condition . . . employment history, . . . family ties, or . . . charitable, or public service" are all "matters that § 3553(a) authorizes the sentencing judge to consider." *Rita v. United States*, 551 U.S. 338, 364–65 (2007) (Stevens, J., concurring).

### B. Departures After Amendment 836.

Effective November 1, 2025, the Sentencing Commission removed the departure step from the Guidelines Manual and deleted most departure provisions, including the Chapter Five policy statements addressing personal characteristics. USSG App. C, amend. 836 (eff. Nov. 1, 2025). The

Commission described the amendment as outcome-neutral: it "intend[ed] that judges who would have relied upon facts previously identified as a basis for a departure would continue to have the authority to rely upon such facts to impose a sentence outside of the applicable guideline range as a variance under 18 U.S.C. § 3553(a)," and the removal of departures "does not limit the information courts may consider in imposing a sentence nor does it reflect a view from the Commission that such facts should no longer inform a court for purposes of determining the appropriate sentence." U.S.S.G. ch. 1, pt. A, intro. cmt. (2025). Accordingly, Mr. Niembro presents each ground below as a basis for a variance. To the extent departure authority remains available to the Court — whether under 18 U.S.C. § 3553(b), under an earlier edition of the Manual, or by treating the former policy statements and commentary as persuasive expressions of the Commission's accumulated judgment — Mr. Niembro moves, in the alternative, for a downward departure on each ground that the former provisions recognized, as identified below.

## IV. GROUNDS FOR A DOWNWARD VARIANCE (OR, IN THE ALTERNATIVE, DEPARTURE)

**Ground 1. The Offense Level Substantially Overstates the Seriousness of the Offense. (Former U.S.S.G. § 2B1.1 cmt. n.21(C); § 3553(a)(1), (a)(2)(A).)**

The Commission itself long recognized that "[t]here may be cases in which the offense level determined under [§ 2B1.1] substantially overstates the seriousness of the offense," and that "[i]n such cases, a downward departure may be warranted." Former U.S.S.G. § 2B1.1 cmt. n.21(C) (preserved at U.S.S.G. app. B, pt. III (2025)). This is such a case. Twenty of Mr. Niembro's thirty-four offense levels — the majority of his guideline exposure — come from a single input: a loss figure of $24,987,853.58 measured at the moment a bank collapsed. That arithmetic is blind to the facts that define culpability here. Mr. Niembro's offense was concealment: he obtained financing from his own Bank through structures that hid his interest from the board, the Comptroller, and

OCIF, when Puerto Rico law required disclosure and prior approval. It was not a taking scheme. The loans bore market interest rates. The 2018 loan was repaid in full, principal and certificate alike. PSR ¶ 49. In December 2022 the entity that held the family home mortgaged it to a private lender, and Mr. Niembro and his wife personally guaranteed the secured debt. The lender's July 17, 2025 demand recites the mortgage of December 23, 2022 on the Key Biscayne residence, the guaranties executed on or about the same day, and a principal balance then of $3,750,000; the residence was sold on June 26, 2026 pursuant to the stipulation this Court approved, ECF Nos. 100, 100-1, 101, and the first mortgage was paid off at closing at $4,455,228.73. And the loss figure is gross, not net: the receiver's collections on an $85 million portfolio continue — the two largest developer-borrowers (Inmobiliaria SF23, C.A. and Constructora SF 2000, C.A.) executed payment agreements with the receiver, Driven, P.S.C., dated June 26, 2024 and December 16, 2024, consolidating ten past-due loans and restructuring the principal to $5,546,311.13 after the receiver waived $465,366.15 in late charges; Nodus, in liquidation under the receiver's direction, has certified receipt of $1,853,855.56 — the $700,000 initial payment under the June 2024 agreement and the quarterly installments of July 15, 2025, October 8, 2025, and January 9, 2026 — and the payer's bank records document two further installments of $384,618.49 each, in January and April 2025, bringing payments to date to $2,623,092.54; the December 2024 agreement schedules sixteen quarterly installments of $384,618.49, beginning January 30, 2025 and payable into a Lloyds Bank escrow. And Mr. Niembro has identified for the Government, in writing and borrower by borrower, approximately $43 million in loans he believes collectible, and has offered to assist in recovering them. That offer matters because of who these borrowers are: overwhelmingly Venezuelan entities and individuals with whom Mr. Niembro dealt directly for decades, and who are more likely to enter good-faith repayment arrangements with someone they

know than with a servicer that has no relationship with them. By his estimate, the receivership has recovered roughly 20% of the portfolio to date, against the approximately 80% he believes recoverable within 24 months.

Mr. Niembro does not ask the Court to substitute gain for loss in the guideline calculation, and he does not contest the 20-level enhancement the parties jointly recommended. He asks the Court to weigh, under § 3553(a), a gap the Government's own filings supply. The advisory range is driven by a loss figure of $24,987,853.58 — the harm the Government attributes to the jointly undertaken scheme. PSR ¶¶ 101, 122; Addendum at 2; ECF No. 93 ¶ 8. Forfeiture measures something narrower: what this defendant himself obtained. *See Honeycutt v. United States*, 581 U.S. 443 (2017). Mr. Niembro agreed to forfeit at least $16,927,926.79 as "the value of the proceeds derived from the wire fraud conspiracy," ECF No. 90 ¶ 9, and on May 20, 2026 the Court entered a preliminary order of forfeiture finding that "the Defendant's personal gain, derived from the offense totals at least $16,927,927" and carrying a money judgment in that amount against him. ECF No. 95, at 6; ECF No. 100 ¶ 3. The $8,059,926.58 difference is not an accounting curiosity. The forfeiture figure was not built out of every transaction in this case; it was built out of the transactions from which this defendant derived proceeds. Two of the largest transactions the Revised PSR attributes to Mr. Ramirez are not among them: neither the $4,500,000 note whose proceeds purchased Mr. Ramirez's personal residence, PSR ¶ 77, nor the loan from which $1,424,222 was disbursed for Mr. Ramirez's benefit, PSR ¶ 80, appears anywhere in the forfeiture order. ECF No. 95. And the Government sought and obtained a separate forfeiture judgment against Mr. Ramirez in his own case. *United States v. Ramirez*, No. 25-CR-20384-KMW (S.D. Fla.), ECF No. 107. Every input in this comparison is stated in a filed paper: on the Government's own numbers, roughly a third of the loss driving Mr. Niembro's offense level corresponds to

proceeds he never obtained. A guideline range built on the full $25 million overstates the seriousness of this defendant's conduct by precisely the margin the Government's own forfeiture figure supplies.

Where, as here, the loss table drives the range, courts have recognized that mechanical arithmetic can eclipse individualized culpability. *See United States v. Adelson*, 441 F. Supp. 2d 506, 512 (S.D.N.Y. 2006) (criticizing "the guidelines' fetish with abstract arithmetic" and varying substantially downward in a fraud case); *United States v. Prosperi, 686 F.3d 32 (1st Cir. 2012)* (affirming a substantial downward variance where the district court found the loss figure "imprecise" and declined to let it "unduly drive its sentencing decision"). The Court should weigh the offense as it actually was: a disclosure crime by a co-owner who repaid, forfeited, and is still trying to make the victim whole, not as the loss table's abstraction.

**Ground 2. Extraordinary Restitutionary and Remedial Conduct. (Former U.S.S.G. § 5K2.0; § 3553(a)(1), (a)(7).)**

Before this prosecution began, Mr. Niembro repaid the 2018 loan in full — $1,400,000 on June 5, 2019, on which Our Microlending retired the Bank's $1,700,000 investment certificate the same day. PSR ¶ 49. He made two further payments toward the 2022 loans, in March and May 2023, totaling $2,788,750. ECF No. 89 ¶ 19. He does not present those two payments as unblemished; the stipulated facts describe how they were routed and where the funds came from, and the Court may weigh that. What is not in dispute is where the money went and what remains: of the $7,000,000 the Bank placed in Our Microlending certificates, $2,680,000 remains owing — the same figure at which restitution was fixed in Mr. Santandreu's case. ECF No. 89 ¶ 20; PSR ¶¶ 12, 67. And with his co-shareholders he agreed to an orderly voluntary liquidation rather than force the regulator to seize the Bank. PSR ¶ 90. Since it began, he has stipulated to forfeiture of at least $16,927,926.79 and of identified assets, and the Court has entered a forfeiture money judgment of

$16,927,927.00 against him, ECF Nos. 90, 95; consented to and facilitated the interlocutory sale of the family residence, the entire net proceeds of which — $2,569,102.21 on the executed closing statement, ECF No. 110, Obj. 7(e) — were paid over to the United States to be held as a substitute res and applied toward the forfeiture, ECF No. 100 ¶ 4; ECF No. 100-1 ¶¶ 9–10; ECF No. 101 — the Government having represented weeks earlier that "[t]he entire balance of the forfeiture money judgment remains unpaid," ECF No. 100 ¶ 3 — leaving $14,358,824.79 of that judgment outstanding against him; and repeatedly offered — in writing, to the Government — to place his knowledge of the loan portfolio at the receiver's service, identifying the borrowers and approximately $43 million in recoverable loans. Two further facts complete this record. First, in the portfolio-migration negotiations conducted with the receiver between May 2023 and April 2024, in documents drafted by the Bank's own counsel, Mr. Niembro offered his personal guarantee of recovery of approximately 80% of the loan portfolio. Second, on June 21, 2023, weeks after the Bank's voluntary surrender, Mr. Niembro required Mr. Ramirez's separation from the ownership and decision-making of Nodus Finance, the recovery vehicle, for failure to perform his commitments; the separation was executed before a notary and communicated to Nodus Finance's general manager. Mr. Niembro submits that restitutionary conduct going well beyond what § 3E1.1 already rewards takes this case outside the heartland, and that the same facts support a variance. Notably, § 3553(a)(7) directs the Court to consider "the need to provide restitution to any victims" — a need served, not disserved, by a sentence that returns Mr. Niembro sooner to the recovery work he has volunteered to perform.

**Ground 3. Cooperation with the Government. (§ 3553(a)(1).)**

From the outset of this case, Mr. Niembro sought to cooperate. Counsel conveyed that intention immediately upon his March 2025 arrest and proposed a proffer as early as April 8, 2025.

The first cooperation meeting took place on June 5, 2025, followed by sessions on July 7 and September 22, 2025, and two detailed written attorney proffers on August 29, 2025, one addressing specific transactions and one providing extensive information concerning high-level Venezuelan corruption and sanctions-evasion structures bearing on United States interests. The Government has advised that it will not move under § 5K1.1 at this sentencing, as it has for his co-conspirator, *Ramirez*, ECF No. 87, noting only that a post-sentencing motion under Federal Rule of Criminal Procedure 35(b) remains possible. But the Government's decision does not remove the assistance already rendered from the Court's consideration: the fact, extent, and sincerity of a defendant's cooperation are part of his history and characteristics under § 3553(a)(1), and the Court may weigh them with or without a Government motion. Nor is the prospect of a later Rule 35(b) motion a reason to discount that history now. Mr. Niembro is to be sentenced on the record as it stands today, and that record includes eighteen months of voluntary, sustained assistance.

**Ground 4. Age and Negligible Risk of Recidivism. (Former U.S.S.G. § 5H1.1; § 3553(a)(2)(B)–(C).)**

Mr. Niembro is 64 years old. The former policy statement on age provided that "[a]ge may be relevant in determining whether a departure is warranted." Former U.S.S.G. § 5H1.1 (preserved at U.S.S.G. app. B, pt. III (2025)). The Commission's research confirms that recidivism declines steeply with age. Over an eight-year follow-up period, 13.4% of offenders age 65 or older at the time of release were rearrested, compared to 67.6% of those released before age 21. U.S. Sent'g Comm'n, The Effects of Aging on Recidivism Among Federal Offenders 2 (Dec. 2017). Mr. Niembro was born in October 1961. On any sentence the Court is considering, he will be released well past that threshold. Both the Guidelines calculations and § 3553(a) "require a judge to consider characteristics of the defendant and the offense that make it more or less likely that the defendant will reoffend." *United States v. Clay*, 483 F.3d 739, 745 (11th Cir. 2007). Mr. Niembro

has no criminal history of any kind: no convictions, no arrests, no pending charges, and zero criminal history points. PSR ¶¶ 145–149. His four-decade career includes majority (70%) ownership of Empire Banco de Ahorros y Creditos, a bank in the Dominican Republic, from 2013 until its sale on January 29, 2018. ECF No. 110, Obj. 7(d) (correcting PSR ¶ 170). The only setting in which his offense was possible — the ownership and management of a bank — is closed to him permanently. See *United States v. Emmenegger*, 329 F. Supp. 2d 416, 428 (S.D.N.Y. 2004) (recidivism risk eliminated where the offense was "particularly adapted to [the defendant's] chosen career" and "[t]hat career is over").

**Ground 5. Physical Condition. (Former U.S.S.G. § 5H1.4; § 3553(a)(2)(D).)**

Mr. Niembro underwent cardiac surgery in 2006 and remains on a daily cardiac regimen, including antiplatelet and beta-blocker therapy. PSR ¶¶ 161–162. Section 3553(a)(2)(D) directs the Court to consider the need to provide medical care "in the most effective manner"; for a 64-year-old cardiac patient, each additional year of imprisonment carries elevated medical risk and public cost that add nothing to the purposes of sentencing. The separately filed objections ask that the PSR's medication record be conformed to the medical records so that the Bureau of Prisons' care classification rests on accurate information.

**Ground 6. Extraordinary Family Circumstances. (Former U.S.S.G. § 5H1.6; § 3553(a)(1).)**

Mr. Niembro's mother, age 89, suffers from Alzheimer's disease and does not know of his circumstances. PSR ¶ 153. She was placed in residential care on February 18, 2026, and he could not be there. Ex. A (I. Álvarez Niembro). He is her only surviving son; his father and both of his brothers have died. PSR ¶¶ 153–154. The wife with whom he has shared the last twenty-five years, who has stood with him through his kidnapping in Venezuela and the family's exile, describes a husband who "es un hombre de hogar, nunca de la calle" ("is a family man, never one to be out on

the streets”), her support through illness and fear. Ex. A (M. Rincón de Niembro). His 20-year-old daughter writes that watching her father carry “the remorse . . . is something I witness closely,” and that it has shown her “the capacity to look honestly at himself, even when it is painful.” Ex. A (M. Niembro Rincón). His son writes that he has “seen him apologize with a sincerity I had never known from him,” and that “he carries it with genuine remorse.” Ex. A (G. Niembro). His eldest daughter, an architect, writes that her father “doesn’t need excuses or invitations to be with us,” that it is “common for him to ring our doorbell several times a week just to say hello and spend time with his granddaughter,” and that when her husband travels for work “my father comes over every afternoon to keep me company and help me until my daughter goes to sleep.” Ex. A (A. Niembro). She has watched “a serious man transform into a tender grandfather.” *Id.* Her husband, a systems engineer who has known Mr. Niembro for approximately fifteen years, dates the change precisely: the “most meaningful shift I witnessed came about five years ago, with the birth of my daughter . . . his granddaughter. From that moment on, I saw a different side of Tomas — one that was more open, affectionate, and deeply engaged.” Ex. A (Brand). The child “absolutely adores him — she asks about him often and is always excited to spend time with him,” and “this is not occasional; Tomas consistently makes a real effort to be present in her life.” *Id.* She is five. A term of imprisonment will interrupt that relationship during the years in which it is formed, and it will do so to a child who has no part in what her grandfather did. The letters filed with this memorandum, Ex. A — from his wife, his three adult children, his son-in-law, a cousin in Spain, two friends of fifty-five and thirty-eight years, the secretary who worked for him for seventeen years, and a banking colleague of thirty years — document a lifetime of quiet generosity. His son recounts that he “helped several of his employees buy their first home and, in other cases, their first car,” and that he covered the schooling of the daughter of a family who had worked with them

for years. Ex. A (G. Niembro). A friend of fifty-five years describes his work gathering supplies, clothing and medicine for the victims of the Vargas tragedy. Ex. A (Tarano). A friend of thirty-eight years recounts that when the factory where he worked burned in January 1990, Mr. Niembro's support — extended once the necessary guarantees were secured — allowed the company to reopen in under three months. Ex. A (Toledo). His secretary of seventeen years writes that when she faced a medical emergency her insurance would not cover and could not meet the cost, "el Sr. Tomás se encargó de sufragar todos los gastos" ("Mr. Tomás took it upon himself to cover all the expenses"), and that on another occasion he gave her daughter a reference and offered to stand as her guarantor so she could pursue a postgraduate degree in Spain. Ex. A (Herrera).

**Ground 7. Status as a Deportable Non-Citizen: Harsher Confinement and Removal. (§ 3553(a)(2)(A).)**

Mr. Niembro is a dual national of Venezuela and Spain; he surrendered his Venezuelan and Spanish passports to the probation office. PSR ¶ 11. His lawful status in the United States expired on March 16, 2025. PSR ¶ 159. The PSR recommends that he be surrendered to United States Immigration and Customs Enforcement ("ICE") for removal proceedings at the completion of his term of imprisonment. PSR ¶ 217. That status makes any given sentence categorically harsher than the same sentence imposed on a citizen, and the difference can be stated arithmetically.

Good conduct time is unaffected by alienage. Mr. Niembro will earn up to 54 days for each year of the sentence imposed, 18 U.S.C. § 3624(b)(1), so a 48-month sentence yields approximately 41 months to serve, and a 60-month sentence approximately 51. Three further reductions available to a citizen will not be available to him. First, the Bureau of Prisons applies a "Deportable Alien" Public Safety Factor to "[a] male or female inmate who is not a citizen of the United States," and provides that "[w]hen applied, the inmate . . . shall be housed in at least a Low

security level institution." BOP Program Statement 5100.08, ch. 5, at 9. The Program Statement provides that the factor "shall not be applied, or shall be removed" when United States Immigration and Customs Enforcement or the Executive Office for Immigration Review has determined that deportation proceedings are unwarranted or has made a finding not to deport at the conclusion of those proceedings, or when the inmate has been naturalized as a United States citizen. *Id.* Mr. Niembro is not a citizen and the Revised PSR expects his removal; he will carry that factor from the day he is designated. The Bureau has since said so directly: announcing on May 28, 2026 that minimum-security camps would be used as transitional placement for inmates who receive a residential reentry or home confinement date, and citing Program Statement 5100.08 CN-3, it stated that "[i]ndividuals not eligible for camp placement include: sex offenders, deportable aliens, Disruptive Group members . . . ." Fed. Bureau of Prisons, *Strategic Expansion of Minimum-Security Camp Utilization* (May 28, 2026). He is, therefore, ineligible for a minimum-security camp regardless of his security score. Second, Program Statement 7310.04 provides that "[i]nmates in the following categories shall not ordinarily participate in CCC programs," and lists among them "[i]nmates who are assigned a 'Deportable Alien' Public Safety Factor." BOP Program Statement 7310.04 § 10.b, at 10. Residential reentry placement and the home confinement authorized by 18 U.S.C. § 3624(c)(2) are therefore not ordinarily available to him as a matter of Bureau policy. Third, First Step Act time credits, which a citizen may apply toward prerelease custody and toward an earlier transfer to supervised release of up to 12 months, 18 U.S.C. §§ 3632(d)(4)(C), 3624(g)(3), may not be applied by a prisoner who "is the subject of a final order of removal," § 3632(d)(4)(E)(i). The Bureau now goes further than the statute. As the courts reviewing that policy have recounted, a memorandum of January 30, 2025 directed that "pending placements in pre-release custody for application of Federal Time Credits (FTC) for all non-U.S.

citizens with active detainers will be canceled," and that "[c]ancelation will occur in all cases where a detainer is lodged and includes cases where a final order of deportation has not been issued"; a second memorandum of April 8, 2025 announced a return to the Bureau's earlier policy, under which a prisoner with an immigration detainer may have time credits applied — up to 365 days — toward early release, but not toward transfer to prerelease custody. District courts are divided on whether that practice is lawful, *compare Adepoju v. Scales*, 782 F. Supp. 3d 306 (E.D. Va. 2025) (granting relief), *with Alqsous v. Emmerich*, No. 3:25-cv-00722, 2026 WL 125691 (W.D. Wis. Jan. 16, 2026) (denying it), and neither this Circuit nor this District has addressed it. Mr. Niembro does not ask the Court to resolve that question. He asks it to recognize the practical consequence: whatever the outcome of the litigation, the Bureau's present practice is to deny prerelease custody to non-citizens once a detainer is lodged, and PSR ¶ 217 contemplates that ICE will take custody of him.

The arithmetic follows. A citizen sentenced to 48 months serves approximately 41 months after good conduct time, and of those may spend up to 12 months on supervised release under § 3624(g)(3) and a further period in prerelease custody under § 3624(c) — residential reentry placement of up to 12 months, § 3624(c)(1), or home confinement for the shorter of ten percent of the term or six months, § 3624(c)(2). Assuming a conservative six months of prerelease custody, that citizen spends roughly 23 months inside an institution. Mr. Niembro will not receive the prerelease custody; and if a final order of removal issues, § 3632(d)(4)(E)(i) bars the application of time credits altogether, so that he serves the full 41 months inside and passes from there into immigration custody. He would, therefore, spend between 29 and 41 months in an institution where a citizen would spend roughly 23. The same arithmetic applied to a 60-month sentence yields approximately 51 months to serve, of which a citizen would spend roughly 33 inside an institution

and Mr. Niembro between 39 and 51. Put another way, a sentence of 48 months will require of him approximately the institutional confinement that a sentence of between 55 and 69 months would require of a citizen, and a sentence of 60 months the institutional confinement of a sentence of between 67 and 81 months. And removal itself, representing permanent separation from the country in which he invested his savings and raised his children, is a severe additional sanction the guideline range does not count. District courts routinely weigh these disparities under § 3553(a).

**Ground 8. The Need to Avoid Unwarranted Sentence Disparity. (§ 3553(a)(6).)**

The person most similarly situated to Mr. Niembro is his co-owner, Juan Francisco Ramirez — charged for the same schemes, whose plea, like Mr. Niembro's, jointly recommended "a loss amount of more than $9,500,000 but not more than $25,000,000," Addendum at 2, and awaiting sentencing before this Court on October 7, 2026. The record shows Mr. Ramirez initiated and was the principal beneficiary of the first Our Microlending transaction, PSR ¶ 32; that the transactions the Revised PSR most emphasizes — the $4,500,000 note that financed his personal residence and the loans in the name of a relative of his wife — are attributed to him, PSR ¶¶ 39, 77, 80; and that Mr. Ramirez did not meet the financial commitments he made to his co-owner as the Bank's position deteriorated. In messages the Government itself produced in discovery, Mr. Niembro wrote to Mr. Ramirez on October 16, 2022 that he was at the limit of his tolerance: "mientes cada vez que dices que vas a pagar" ("you lie every time you say you are going to pay"), while "cada vez hay que poner más capital por las operaciones que no atiendes" ("more and more capital has to be put in because of the operations you do not attend to"). Mr. Ramirez's written reply the next morning conceded the point: "Tienes mucha razón. . . . Los compromisos que te he dicho y no he cumplido es porque la realidad es que no tengo el dinero" ("You are quite right. . . . The commitments I have given you and not kept are because the reality is I do not have the

money"). Of the Bank's approximately $85 million portfolio, 20.65% consisted of loans recommended by Mr. Ramirez, roughly half of which the Bank's controller and outside auditors required to be provisioned — more than $8 million in write-downs. The Government has moved for a substantial-assistance reduction for Mr. Ramirez, *Ramirez*, ECF No. 87, while advising that no such motion will be made for Mr. Niembro at sentencing. Sentencing parity between the Bank's two co-owners, informed by Mr. Niembro's stronger record of repayment and recovery efforts, is required by § 3553(a)(6). The comparison with Emilio Santandreu (the lender whose institution issued the certificates and who participated in both transactions) is already concrete: he was sentenced to 34 months' imprisonment, reduced on the Government's Rule 35(b) motion to 22 months on March 24, 2026, with restitution fixed by joint stipulation at $2,680,000. *United States v. Santandreu*, No. 25-CR-20417-CMA (S.D. Fla.), ECF Nos. 47, 48–50; PSR ¶ 12.

National data confirm that within-range sentences at these levels are the exception. The Judiciary Sentencing Information platform reports that over the last five fiscal years, defendants with the same primary guideline, final offense level, and criminal history category received, at Probation's level 38/CHC I, an average of 158 months and a median of 114 months across 14 defendants. PSR ¶ 183. Those figures are compiled, in the Probation Office's own words, "after excluding defendants who received a § 5K1.1 substantial assistance departure." PSR ¶ 183. They, therefore, describe what defendants who came to sentencing without a substantial-assistance motion — defendants in precisely Mr. Niembro's position — actually received. Two things follow. First, even among those defendants the median sentence falls roughly 10 years below the bottom of the range Probation calculates; a within-range sentence would place Mr. Niembro above the great majority of similarly situated defendants nationwide. Second, the platform's cohort is defined by guideline inputs alone, and those inputs cannot capture what separates this defendant from those

14: eighteen months of voluntary assistance for which no motion will be made, Ground 3; a forfeiture judgment measuring his own gain at roughly a third less than the loss that drives the range, Ground 1; repayment and recovery efforts that began before the prosecution did, Ground 2; and a deportable-alien status that will make every month he serves harder, and longer, than the same month served by anyone in that cohort, Ground 7. In the end § 3553(a)(6) directs the comparison not to a guideline cell but to the men who committed these offenses with him. Measured against Mr. Santandreu's 22 months and the substantial-assistance motion the Government has filed for Mr. Ramirez, a sentence of 48 to 60 months places Mr. Niembro well above — not below — his co-participants.

**Ground 9. Punishment Already Suffered and Collateral Consequences. (§ 3553(a)(2)(A)–(B).)**

Mr. Niembro has already lost nearly everything a four-decade professional life can accumulate: his bank; his career and licenses across three countries; his family's home, sold with this Court's approval, ECF Nos. 100, 101; a $16.9 million forfeiture judgment, ECF No. 95; the civil action filed against him in relation to this conduct, PSR ¶ 108; and his name, in the community of Venezuelan exiles that knows him best. Collateral consequences are part of the calculus: a sentencing court "is specifically required by section 3553(a) to consider the 'just punishment for the offense,'" and "[i]t is difficult to see how a court can properly calibrate a 'just punishment' if it does not consider the collateral effects of a particular sentence." *United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) (upholding, as to co-defendant Yousry, the district court's reliance on the collateral effects of conviction, including the foreclosure of his career, in imposing a non-Guidelines sentence); *see Adelson*, 441 F. Supp. 2d at 514 ("With his reputation ruined by his conviction, it was extremely unlikely that he would ever involve himself in future misconduct."). General deterrence is served by what the public has already seen: concealing insider loans cost this

defendant his institution, his fortune, his home, and his liberty. The marginal months at issue between the requested sentence and the advisory range add no deterrent value; they subtract only from a dependent mother, a wife, and children. His eighteen months of compliance on bond, PSR ¶¶ 9–10, confirm that neither incapacitation nor respect for law requires more.

**Ground 10. The Combination of Circumstances. (Former U.S.S.G. § 5K2.0(c); § 3553(a).)**

Finally, even if no single ground above sufficed standing alone, their combination does. The former guidelines permitted a departure based on "a combination of two or more offender characteristics or other circumstances, none of which independently is sufficient to provide a basis for departure," where those circumstances "taken together, make the case an exceptional one" and each is "present to a substantial degree." Former U.S.S.G. § 5K2.0(c) (preserved at U.S.S.G. app. B, pt. III (2025)). This is that case. A 64-year-old, first-time-offender, cardiac-patient, deportable defendant who repaid, cooperated, forfeited, and has volunteered to keep recovering money for the victim presents, in combination, a case far outside the heartland of the fraud guideline — and far from any case requiring a sentence of the length the loss table generates.

## V. THE REQUESTED SENTENCE

The grounds above converge on a number. The Government's own individualized measure of what this defendant obtained is a forfeiture money judgment of $16,927,927.00 — roughly a third less than the $24,987,853.58 loss figure from which twenty of his thirty-four offense levels are derived. Ground 1. Before anyone charged him he had repaid the 2018 loan in full and made substantial repayment toward the 2022 loans, personally guaranteed the debt secured by the family home, and agreed with his co-shareholders to an orderly liquidation; since then he has paid over the entire $2,569,102.21 of net proceeds from the sale of that home and has offered the receiver his knowledge of the loan portfolio, identifying approximately $43 million in recoverable loans.

Grounds 2, 9. He gave the Government eighteen months of voluntary assistance and will be sentenced without a motion for it. Ground 3. The two men who committed these offenses with him are a lender's principal whose sentence now stands at 22 months and a co-owner who will be sentenced with a substantial-assistance motion. Ground 8. He is a 64-year-old cardiac patient and a first-time offender whose four-decade career, and the only setting in which this offense was possible, are permanently closed to him. Grounds 4, 5. His 89-year-old mother entered residential care without him, and a five-year-old granddaughter asks for him. Ground 6. And he will serve whatever the Court imposes without the prerelease custody a citizen receives, and be removed from the country at the end of it: 48 months will confine him about as long as 55 to 69 months confines a citizen, and 60 months about as long as 67 to 81. Ground 7. Forty-eight months answers every purpose Congress set out in § 3553(a). Sixty is the outer limit of what this record can bear.

For these reasons, Mr. Niembro respectfully requests that the Court: (1) adopt the parties' jointly recommended guideline calculation (total offense level 34; 151–188 months); (2) grant a downward variance — or, in the alternative and to the extent available, a downward departure — and impose a sentence of 48 months' imprisonment, and in no event a sentence greater than 60 months; (3) impose no fine, because restitution is mandatory, 18 U.S.C. § 3663A(a)(1); PSR ¶ 193, a fine may be imposed "only to the extent that such fine or penalty will not impair the ability of the defendant to make restitution," 18 U.S.C. § 3572(b), and the corrected financial record does not support ability to pay both — the unpaid balance of the forfeiture judgment alone, $14,358,824.79, exceeds Mr. Niembro's restated net worth before any restitution is added; (4) set restitution for determination within 90 days pursuant to 18 U.S.C. § 3664(d)(5), PSR ¶¶ 114, 193; and (5) recommend to the Bureau of Prisons designation to a facility with a medical care level

appropriate to his cardiac condition, and that his medical records accompany his designation packet.

## VI. CONCLUSION

Mr. Niembro's offenses were serious, and he accepted responsibility for them promptly and without reservation. On this record, a sentence of 48 months is sufficient and any sentence within the advisory range would be greater than necessary to achieve every purpose Congress set out in § 3553(a).

Dated: September 15, 2026

Respectfully submitted,

/s/ Michael B. Nadler
MICHAEL B. NADLER
FL BAR 0051264
848 BRICKELL AVENUE PH5-J72
MIAMI, FL 33131-1824
TELEPHONE: (305) 709-2573
MNADLER@ARKTOUROS.CO
Counsel for Defendant

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 15, 2026, a true and correct copy of the foregoing was electronically filed with the Clerk of the Court using CM/ECF, which will send a notice of electronic filing to all counsel of record, and was served by electronic mail on United States Probation Officer Estefania Vega-Romero.

/s/ Michael B. Nadler
MICHAEL B. NADLER